COPY


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

GOULD PAPER CORPORATION,        :

          Plaintiff,        :

v.        :

JOHN R. CURTIN and SALVATORE        :
CAPALBO,        :

          Defendants.        :

------------------------------------------------------X

**JUDGE BUCHWALD**

**07 CIV        9524**

07 Action No.

ECF   CASE

October 25, 2007

OCT 2 5 2007
U.S.D.C. S.D.N.Y.
CASHIERS

## <u>COMPLAINT</u>

    The plaintiff, Gould Paper Corporation, by and through its undersigned counsel, as and for its Complaint in this action, hereby alleges as follows:

### <u>Nature of this Action</u>

    1.    This is an action by Gould Paper Corporation ("Gould" or "plaintiff") against its former employees, John R. Curtin and Salvatore Capalbo, arising from defendants' tortious conduct prior to resigning from Gould, and their misrepresentations and omissions concerning the sale of paper to a particular customer and whether the receivable associated therewith was collectible. In fact, defendants' misrepresentations and omissions in connection with that transaction were part of a pattern of misconduct undertaken in an effort to make their Division's performance appear stronger on its profit and loss statement in order to maintain their compensation.

    2.    In addition to Gould's claim for damages against both defendants, Gould seeks an order rescinding a certain Termination Agreement between Gould

and defendant Curtin based on Curtin's fraudulent misrepresentations and omissions in connection therewith.   In the event the Court rescinds the Termination Agreement, Gould does not and shall not seek to enforce the non-competition and confidential information restrictions contained in Curtin's Employment Agreement that were released by Gould as part of the Termination Agreement.   In other words, Gould does not seek to prohibit Curtin from continuing or restricting his current employment with a competitor of Gould known as Central National-Gottesman, Inc. ("CNG"), nor does Gould allege that CNG participated in or had knowledge of any of the conduct that is the subject of this Complaint.

## Parties

3.      Gould is a New York corporation which maintains its principal place of business in New York, New York.

4.      The defendant John R. Curtin ("Curtin") is an individual who is a resident and citizen of the State of Connecticut.

5.      The defendant Salvatore Capalbo ("Capalbo") is an individual who is a resident and citizen of the State of Connecticut.

## Jurisdiction and Venue

6.      Jurisdiction over this matter arises under 28 U.S.C. §1332.   The amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      This Court has personal jurisdiction over defendants because certain of the conduct that forms the basis for Gould's claims occurred in New York, the defendants currently are employed in New York, and the defendant

Curtin consented to jurisdiction in New York with respect to any action relating to the Termination Agreement that Gould seeks to rescind.

8.    Venue is proper in this Judicial District under 28 U.S.C. §1391(a)(2), as a substantial part of the events and omissions giving rise to the claims occurred within this District. In addition, defendant Curtin consented and submitted to venue in this District with respect to any action relating to the Termination Agreement that Gould seeks to rescind.

## Background

9.    Gould is engaged in the business of, among other things, distributing and selling paper for multiple markets, including fine papers, commercial printing, lithography, packaging materials, newsprint, direct mail, catalogs, envelopes and specialty papers.

10.    From February 2002 through April 2007, Curtin was employed by Gould as the President of its International Packaging Division pursuant to a written Employment Agreement. The Agreement required Curtin to "diligently and competently" perform his duties in connection with the business and affairs of the International Packaging Division, and gave Gould the right to terminate the Agreement for "Cause," the definition of which included a willful act of dishonesty or fraud, or any act in violation of Gould's policies, resulting in material injury to Gould. The Employment Agreement also imposed certain post-employment restrictions on Curtin, including a clause prohibiting Curtin from competing with Gould for a period of one year following the termination of the

3

Agreement, and a clause prohibiting Curtin from disclosing any of Gould's confidential information at any time.

11.    The Employment Agreement further provided that Gould would compensate Curtin through payment of salary and bonus. Curtin was not paid commissions.

12.    From February 2002 through April 2007, Capalbo was employed by Gould in customer service and inside sales within Gould's International Packaging Division. Unlike Curtin, he did not have a written Employment Agreement. He reported directly to Curtin, and worked closely with him during the five years that they worked together at Gould. Capalbo and Curtin also worked together before they joined Gould in February 2002, and, on information and belief, both have worked for CNG since resigning from Gould.

13.    While employed by Gould, Curtin was responsible for managing the operations of the International Packaging Division. That Division was primarily focused on the sale of packaging materials for the food service industry. The International Packaging Division, like Gould's other Divisions, typically engaged in transactions where paper or packaging materials were purchased only after a customer or customers had committed to purchase that product from Gould. Gould typically arranges for the shipment of product from the paper mill or the converter directly to the customer, without taking physical possession.

14.    As is the case with all of Gould's Divisions, the International Packaging Division was responsible for obtaining written confirmation of significant orders from customers, either in the form of purchase orders or some

other form of written or electronic acknowledgment such as an e-mail. Customers were to be invoiced after the product had been shipped to the customer. Except for limited circumstances not applicable here, invoices to customers were issued by Gould's billing department in New York regardless of the location of the Division responsible for the sale, in order that the sales could be properly recorded in Gould's accounting, billing and accounts receivable systems.

15.    Other than the credit and billing functions, the International Packaging Division exercised substantial autonomy over its operations. It operated from a separate office located in Greenwich, Connecticut. It exercised control over the pricing of the products that it sold and the selection of mills with which to do business. Its operations were the subject of a separate profit and loss statement.

16.    Gould spent substantial sums to support the operation of the International Packaging Division, including costs of almost $500,000 from August 2006 (when the acts of intentional misconduct that are the subject of this Complaint commenced) until the sale of certain of the Division's assets in April 2007. Despite this investment, the International Packaging Division incurred significant losses while managed by Curtin, including losses of approximately $465,000 in 2005, $315,000 in 2006, and $450,000 during the first quarter of 2007.

17.    Gould paid substantial compensation to Curtin and Capalbo during the time they were employed by Gould, including significant amounts subsequent to the acts of intentional misconduct that are the subject of this Complaint.

**Curtin and Capalbo's False Representations to Gould
Concerning the Golden West Receivable**

18.    During 2006, Capalbo learned that a paper mill known as Weyerhaeuser was offering to sell a substantial quantity of uncoated paper at a price in the range of $600/ton. That paper would need to be treated with a poly extrusion before it could be used for commercial purposes.

19.    In mid-2006, Capalbo contacted Golden West Paper Converting Corp. ("Golden West") and solicited it to purchase from Gould the paper being offered by Weyerhaeuser.

20.    In August 2006, Capalbo ordered approximately 500 tons of the uncoated paper from Weyerhaeuser, and made arrangements to have the paper shipped from Weyerhaeuser's facility in Long View, Washington to a paper converter known as Graphics Packaging in Alabama to have a poly coating applied, and then shipped to Golden West in Oakland, California. In September 2006, Capalbo ordered another 500 tons from Weyerhaeuser, and made similar arrangements for the application of the poly coating by Graphics Packaging and the shipment of the finished product to Golden West. The total cost to Gould of the paper, converting costs and freight charges was $927,446.17.

21.    Capalbo ordered the paper from Weyerhaeuser and made arrangements for the application of a poly coating despite the fact that neither Golden West nor any other customer had issued a purchase order or other written or electronic commitment for the paper.

22.    Beginning in mid-August 2006, Capalbo recorded the proposed transaction with Golden West as a sale and caused invoices to be issued to Golden

West, despite the fact that there were no written or electronic orders for the paper and the coating for the final product had not been completed (thereby violating Gould's policy of billing the customer only when the final product was shipped). These initial invoices reflected a sales price of approximately $870/ton and credited the freight charges back to Golden West. Then, in late October 2006, Capalbo caused the invoices to be credited and re-billed, in this instance charging Golden West for freight. The total amount invoiced to Golden West in late October 2006 was approximately $957,625, with the invoices reflecting an agreed purchase price of $870/ton plus freight charges of approximately $87,000. Capalbo caused these invoices to be issued despite knowing that Golden West was unwilling to take the paper at the price offered.

23.    In fact, when paper was delivered to Golden West beginning in late October 2006, it declined to accept delivery, contending that it had never ordered the paper. Capalbo caused the paper to be stored in a warehouse in Oakland, California at Gould's expense. He failed to advise Gould that Golden West had declined to accept the paper and that the paper had been warehoused at Gould's expense.

24.    In November 2006, Capalbo began communicating with a customer known as National Board Exchange ("NBE") for the possible purchase of some or all of the Weyerhaeuser paper that was being stored in the Oakland warehouse. He participated in these communications despite having previously represented to Gould that the paper had been sold to Golden West and entering it as a completed transaction in Gould's billing system.

7

25.    In late January 2007, Capalbo again caused the Golden West invoices to be credited and re-billed, with a new due date of March 30, 2007. He took this action after Gould questioned why the October invoices had not been paid, to which Capalbo responded that the payment delay was due to delays in the delivery of the paper. He also advised Gould for the first time that the paper was being stored in a warehouse at Gould's expense, allegedly because Golden West had no storage capacity. He again failed to inform Gould that Golden West had declined to purchase the paper at the price offered, instead representing that Golden West had agreed to take the paper at the invoiced price. He also failed to inform Gould that he was simultaneously negotiating with NBE for the purchase of some or all of the paper.

26.    On February 15, 2007, in response to further questions from Gould's credit department concerning the status of the receivable and why it had been re-billed, Capalbo sent an e-mail to Constantin Dardac, Gould's Assistant Controller, representing that the long production process had caused severe delays in the delivery of the paper to the customer, causing the customer to obtain replacement paper. Capalbo represented that Golden West was still committed to taking all of the paper and paying for it by the due dates on the re-billed invoices; however, since Golden West did not have room in its warehouse to store the paper, Gould (through Capalbo and Curtin) had agreed to store the paper in the Oakland warehouse until Golden West had storage space.

27.    These representations were false.  In fact, Golden West had not agreed to take the paper or pay the invoices, and Capalbo was actively negotiating with NBE during this time for the sale of the paper.

28.    On February 21, 2007, Carl Matthews (Gould's Chief Financial Officer) and Constantin Dardac met with Curtin and Capalbo at the International Packaging Division's office in Greenwich, Connecticut to discuss the Division's financial results.  Both Curtin and Capalbo represented that there were no problems with any of the International Packaging Division's receivables except for one that is not relevant here, and that except for the one identified, all of the receivables were collectible.  With particular respect to the Golden West receivable in the amount of $957,625, Curtin and Capalbo represented that there was no problem with the order and that Golden West had committed to pay the balance in full.

29.    In early March 2007, during a telephone conversation with Harry E Gould, Jr. (Gould's Chairman and Chief Executive Officer), Curtin represented that the Golden West invoices would be paid in full.  He failed to disclose the problems with the proposed sale.

30.    On March 29, 2007, during a meeting with Harry E. Gould, Jr. and Carl Matthews to discuss the future of the International Packaging Division, Curtin again represented that the Golden West receivable was collectible.  He failed to disclose the problems with the proposed sale.

31.    In early April 2007, Gould began negotiating the sale of certain assets of its International Packaging Division to CNG, which is a competitor of

Gould. Around the same time, Gould and Curtin began negotiating a possible termination of Curtin's Employment Agreement and the restrictive covenants therein, which would enable Curtin to continue to head the International Packaging Division for CNG in the event the sale of those assets to CNG was concluded. During the course of the latter negotiations, Curtin requested a release from Gould of not only his non-competition and confidential information restrictions, but any claims Gould might have against him for his conduct prior thereto.

32.     During a meeting on April 4, 2007 with Carl Matthews, Constantin Dardac and Carl Degisi (Gould's Credit Manager), Curtin and Capalbo again represented that there were no problems with the Golden West receivable. Curtin and Capalbo represented that Golden West was about to take delivery of the paper from the warehouse, and would send an immediate payment of $550,000 and the balance by the end of the month.

33.     Gould elected to enter into the Termination Agreement with Curtin dated as of April 9, 2007 (the "Termination Agreement") in reliance on: (i) the representations of Curtin and Capalbo with respect to the collectibility of the Golden West receivable, Golden West's acceptance of the paper and agreement to pay the invoices in full; and (ii) Curtin and Capalbo's failure to disclose the problems with the Golden West receivable and negotiations with NBE for the purchase of some or all of the paper. The Termination Agreement included a release of any claims Gould might have against Curtin. A true and correct copy of the Termination Agreement is attached hereto as Exhibit A.

34.     Certain payments were applied against the Golden West receivable in April 2007, leaving an outstanding balance of approximately $206,000. When no additional payments were forthcoming after April 2007, Gould contacted Golden West and inquired when payment of the remaining balance on the account would be made.

35.     Golden West advised Gould that it had paid in full the indebtedness resulting from the order in question. Gould learned for the first time that Golden West had not ordered or purchased the 1,000 tons of paper from Gould, as indicated in the International Packaging Division's records and invoices. Rather, according to Golden West, when Capalbo had initially solicited Golden West for this order, Golden West had informed him that it neither had a customer for the paper nor the capacity to store it, and therefore declined the proposal. Gould's investigation uncovered that in March 2007, Capalbo had sold approximately 378 tons of the product to NBE at a price of $745/ton including freight charges. Gould learned that when NBE insisted on a written invoice, Capalbo and/or Curtin had created and delivered to NBE an invoice bearing the International Packaging Division's Greenwich address and the same invoice number and customer number as the Golden West invoice, to ensure that the payment from NBE in the amount of $281,743 would be applied to the Golden West receivable. That invoice to NBE had never been provided to Gould's accounting department, in violation of Gould's policies. Gould also learned that Capalbo had negotiated the sale of the remaining paper to Golden West at a price far less than that reflected in the original invoices to Golden West without

disclosing same to Gould. Moreover, Capalbo had informed Golden West that Gould would sell it 752 tons of paper, when only 644 tons were available following the sale to NBE; thus, Golden West demanded a refund of almost $74,000 from the $470,000 payment it had made in April 2007 (which Gould has since paid pursuant to an agreement with Golden West). Golden West provided Gould with a copy of correspondence from Capalbo to Golden West dated March 21, 2007, in which Capalbo had confirmed that Golden West would purchase the inventory at $650/ton, including freight (as opposed to the price of $870/ton, plus freight, reflected in the records prepared by Capalbo and Curtin). Thus, contrary to the representations made by Curtin and Capalbo, the balance of the receivable in the amount of approximately $206,000 was not collectible, and Gould in fact owed Golden West approximately $74,000, for a total cost to Gould of approximately $280,000.

36.    Had Gould known of Curtin's and Capalbo's wrongful conduct with respect to the purchase of the Weyerhaeuser paper when that conduct commenced in August 2006, it would have immediately terminated their employment and the operations of the International Packaging Division, and terminated Curtin's Employment Agreement for cause.

### Capalbo's Attempted Sale to Aspen Products

37.    Aspen Products, Inc. is a customer of Gould's which maintains its headquarters in Kansas.

38.    On or about August 1, 2006, Capalbo ordered a large quantity of paper from a supplier known as Mead Westvaco at a cost to Gould of

approximately $161,000. On information and belief, Capalbo ordered the paper with the intent of selling it to Aspen. However, at no time did Capalbo obtain a purchase order from Aspen or other written or electronic acknowledgement.

39.    In late August 2006, Capalbo recorded the proposed transaction with Aspen as a sale and caused invoices to be issued to Aspen, despite the fact that there was no written or electronic order for the paper and the product had not been shipped or delivered to the customer. In fact, Capalbo had been forced to warehouse the product at Gould's cost.

40.    On information and belief, Capalbo reported a sale and caused invoices to be issued in order to improve the perceived performance of the International Packaging Division on its profit and loss statement.

41.    In late December 2006, Capalbo caused the invoices to Aspen to be credited and re-billed, despite the fact that Aspen had never issued a written or electronic purchase order or acknowledgement.

42.    Aspen ultimately declined to purchase the paper from Gould, leaving Gould to sell the paper to CNG at a loss subsequent to the termination of Curtin's and Capalbo's employment.

43.    At all relevant times, Curtin was aware of and directed Capalbo's conduct in connection with the order of the paper from Mead Westvaco, the reported sale to Aspen, and the re-billing of the sale.

## Curtin's Misrepresentation Concerning Commissions Payable

44.    Subsequent to the execution of the Termination Agreement, Gould also discovered that in October 2006, Curtin had changed the identity of the

responsible salespersons on certain customer account records so that he was credited with certain sales when in fact those sales should have been credited to the previously-designated salespersons who, unlike Curtin, were compensated by commissions. The total amount of sales for which Curtin improperly identified himself as the responsible salesperson were approximately $2.6 million. On information and belief, Curtin failed to correctly attribute those sales in order to make the International Packaging Division's profit and loss statement appear stronger.

45.    As a result of Curtin's failure to attribute those sales to the persons responsible, Gould was required to pay the salespersons $56,289 in total commissions which had not been accrued.

46.    Gould relied on the accuracy of the profit and loss statement for the International Packaging Division, including Gould's liability for commissions payable, and Curtin's representations concerning the identity of salespersons to whom certain sales should be credited, in deciding to enter into the Termination Agreement.

## First Cause of Action
### (Fraud, Against Curtin and Capalbo)

47.    Gould repeats the allegations set forth in paragraphs 1 through 46 of this Complaint as if set forth in full herein.

48.    At all relevant times, Curtin was aware of and directed Capalbo's actions with respect to the negotiations and sale of the Weyerhaeuser paper to NBE and the negotiations and sale to Golden West.

49.    Curtin and Capalbo falsely represented to Gould that Golden West had accepted the paper and agreed to pay the amount invoiced in full, when in fact some of the paper had been sold to NBE, and the sales prices to NBE and Golden West were substantially less than the amounts reflected in Gould's invoices.

50.    Curtin and Capalbo also failed to advise Gould of the negotiations and sale to NBE and their creation of an unauthorized invoice, despite having an obligation to do so.

51.    Curtin and Capalbo also falsely recorded a sale of paper to Aspen and caused invoices to be issued to Aspen, notwithstanding that Aspen had never issued a purchase order or other written or electronic acknowledgement for the paper and in fact had declined to purchase the paper.

52.    In addition, Curtin falsely represented to Gould that he was the salesperson responsible for certain sales and that no commissions were payable to other salespersons in connection with those sales.

53.    Gould reasonably relied on the representations and non-disclosures of Curtin and Capalbo in entering into the Termination Agreement with Curtin.

54.    Gould has suffered damages as a proximate result of the fraudulent representations and non-disclosures of Curtin and Capalbo.

**Second Cause of Action**
**(Breach of Fiduciary Duty, Against Curtin and Capalbo)**

55.    Gould repeats the allegations set forth in paragraphs 1 through 54 of this Complaint as if set forth in full herein.

56.    While employed by Gould, Curtin and Capalbo owed Gould the fiduciary duties of loyalty and honesty, and to act in good faith and in Gould's best interests.

57.    Curtin and Capalbo breached their duties to Gould by: (i) failing to disclose to Gould the problems with the Golden West transaction, including Golden West's refusal to accept the paper at the price initially offered and reflected in the invoices, and the subsequent negotiations and sales to Golden West and NBE at prices less than the amounts invoiced; (ii) misrepresenting to Gould that Golden West had accepted the paper and agreed to pay the full amount invoiced, and that the receivable was collectible; and (iii) recording a sale of paper to Aspen and causing invoices to be issued to Aspen notwithstanding that Aspen had never issued a purchase order or other written or electronic acknowledgement for the paper and in fact had declined to purchase the paper.

58.    In addition, Curtin breached his fiduciary duties to Gould by falsely representing to Gould that he was the salesperson responsible for certain sales and that no commissions were payable to other salespersons in connection with those sales.

59.    Gould has suffered damages as a proximate result of Curtin's and Capalbo's breach of their duties.

### Third Cause of Action
### (Negligence, Against Curtin and Capalbo)

60.    Gould repeats the allegations set forth in paragraphs 1 through 59 as if set forth in full herein.

61. While employed by Gould, Curtin and Capalbo owed Gould a duty to act with due care on the transactions on which they were working.

62. Curtin and Capalbo breached their duties of care in connection with the Golden West transaction by ordering paper for which they did not have a written or electronic commitment from a customer, recording a sale to Golden West and causing invoices to be issued when Golden West had not agreed to the proposed transaction, creating and submitting an invoice to NBE without reporting it to Gould's credit department, making misrepresentations to Gould concerning the status of the reported sale to Golden West, and failing to disclose to Gould the sale to NBE, the problems with the proposed transaction to Golden West, and the prices at which the product was sold to NBE and Golden West.

63. Curtin and Capalbo breached their duties of care in connection with the Aspen transaction by ordering paper for which they did not have a commitment from a customer, recording a sale to Aspen and causing invoices to be issued when Aspen had not agreed to the proposed transaction, making misrepresentations to Gould concerning whether the customer had agreed to accept the product and pay the invoices, and failing to disclosure to Gould that Aspen had declined to purchase the paper.

64. Curtin also breached his duty of care by changing the identity of the responsible salespersons on certain customer account records to himself and failing to disclose that commissions were owed to other salespersons.

65. Gould has suffered damages as a proximate result of the negligence of Curtin and Capalbo.

17

## Fourth Cause of Action
## (Beach of Contract, Against Curtin)

66.     Gould repeats the allegations set forth in paragraphs 1 through 65 of this Complaint as if set forth in full herein.

67.     Curtin breached his Employment Agreement by failing to diligently and competently perform his duties in connection with the business and affairs of the International Packaging Division, including participating in or allowing Capalbo to purchase paper for which the Division did not have a written or electronic commitment from a customer, participating in or allowing Capalbo to record sales and cause invoices to be issued when customers had not agreed to the proposed transaction, making misrepresentations to Gould concerning the status of the reported sale to Golden West, and failing to advise Gould of the sale to NBE and problems with the proposed transaction with Golden West.

68.     Gould has suffered damages as a result of Curtin's breach of the Employment Agreement.

## Fifth Cause of Action
## (Unjust Enrichment, Against Curtin and Capalbo)

69.     Gould repeats the allegations set forth in paragraphs 1 through 68 of this Complaint as if set forth in full herein.

70.     Curtin and Capalbo were unjustly benefited by Gould's payment of compensation to them subsequent to their wrongful acts and non-disclosures, which payments were to the detriment of Gould.

WHEREFORE, plaintiff Gould Paper Corporation demands the following relief:

1.  An Order rescinding the Termination Agreement due to the fraudulent actions and non-disclosures of defendant Curtin;

2.  Compensatory damages;

3.  Disgorgement of compensation paid to defendants Curtin and Capalbo;

4.  Attorneys' fees; and

5.  Such other and further relief as the Court deems appropriate.


WHITMAN BREED ABBOTT &
MORGAN LLC


By: _James C. Riley_____

James C. Riley (JR 2621)
500 West Putnam Avenue
Greenwich, Connecticut 06830
Tel: (203) 862-2342
Fax: (203) 869-1951
jriley@wbamct.com

*Attorneys for Plaintiff Gould
Paper Corporation*

19

# Exhibit A

## TERMINATION AGREEMENT

TERMINATION AGREEMENT as of the 9th day of April, 2007 between GOULD PAPER CORPORATION, a New York corporation ("Gould"), with its principal place of business at 11 Madison Avenue, New York, N.Y. 10010, and JOHN R. CURTIN ("Executive"), residing at 286 Round Hill Road, Greenwich, CT 06831.

WHEREAS, Gould and Executive are parties to a certain Employment Agreement dated February 7, 2002, as amended, (the "Employment Agreement") pursuant to which Executive has been employed as President of the Gould International Packaging Division (the "Packaging Division"); and

WHEREAS, the Employment Agreement, in Section 3.1, prohibits Executive from being employed for a competitor of the Packaging Division; and

WHEREAS, Gould is selling certain of the assets of the Packaging Division to Central National-Gottesman, Inc. ("CNG"), a competitor of Gould; and

WHEREAS, Executive desires to be employed by CNG and has requested that Gould waive the provisions of Section 3.1 of the Employment Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto agree as follows:

1.      The Employment Agreement and Executive's employment with Gould is hereby mutually terminated effective April 9, 2007. Executive acknowledges that he has been advised of his rights under COBRA.

2.      Executive hereby waives his right to any payments pursuant to the Bonus Plan and Production Bonus Plan provided for in Sections 1.3(b) and (c) of the Employment Agreement.

3.      Executive acknowledges that he has received all expense reimbursements due him as of the date hereof and that he is not due any vacation pay for 2007.

4.      Gould hereby releases Executive from the provisions of Sections 3.1 and 3.2 of the Employment Agreement.

5.      In consideration of Gould's releasing Executive from the non-competition provisions of Section 3.1 of the Employment Agreement, Executive hereby forever releases and discharges Gould and its subsidiaries, affiliates, officers, directors, employees and agents from any and all claims, demands, causes of action and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common law, statutory, federal, state, local or

otherwise), whether known or unknown, by reason of any act, omission, transaction or occurrence, up to and including the date of execution of this Agreement.

6.    Gould, on behalf of itself and its subsidiaries, affiliates, officers, directors, employee and agents hereby forever releases and discharges Executive from any and all claims, demands, causes of action and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common law, statutory, federal, state, local or otherwise), whether known or unknown, by reason of any act, omission, transaction or occurrence, up to and including the date of execution of this Agreement.

7.    This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.

8.    This Agreement may be altered, modified or amended only by a writing signed by all parties hereto.

9.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.    This Agreement shall be governed by and construed under the internal laws of the State of New York, without reference to principles of conflict of laws or choice of laws. Any action, suit or proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in the Borough of Manhattan and each party consents and submits to such jurisdiction and venue. The parties waive trial by jury. In any action or proceeding commenced to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and expenses.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

GOULD PAPER CORPORATION

By: _____          _____
Carl Matthews                                          John Curtin
Executive Vice President

-2-